UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80339-CIV-MIDDLEBROOKS/JOHNSON

LEILA MEYERSON, LEILA MEYERSON
REVOCABLE TRUST, L&M MEYERSON FAMILY
TRUST, L&M FAMILY LIMITED PARTNERSHIP,
DAVID MEYERSON, DAVID MEYERSON TRUST,
JESSICA SHOSHANA MEYERSON TRUST, RICHARD ARON,
CINDIE KASTENBAUM, JULIA KASTENBAUM TRUST,
HARRY MICHAEL KASTENBAUM TRUST,
STUART MEYERSON, SAMUEL MANN MAYERSON
TRUST, BENJAMIN MANN MEYERSON TRUST,
STUART MEYERSON 9/14/1995 TRUST,
SEYMOUR LAPP, SEYMOUR LAPP REVOCABLE TRUST,
SYDNEY KASTENBAUM, DONALD MAYERSON,
TERRY GUTKIN, BARBARA GUTKIN, TERRY B.
GUTKIN AND BARBARA A. GUTKIN REVOCABLE TRUST,
MAISIE POTASHNICK,

    Plaintiffs,

v.

ALLEN MCGEE, MICHAEL
WALLACE, LLOYD GOLDMAN,
WILFRED POSLUNS, and
RADIOLOGY CORPORATION OF
AMERICA, INC., a Delaware Corporation,

    Defendants.

_____/

## __AMENDED COMPLAINT__

   Plaintiffs LEILA MEYERSON, LEILA MEYERSON REVOCABLE TRUST, L&M

MEYERSON FAMILY TRUST, L&M FAMILY LIMITED PARTNERSHIP, DAVID

MEYERSON, DAVID MEYERSON TRUST, JESSICA SHOSHANA MEYERSON TRUST,

RICHARD ARON, CINDIE KASTENBAUM, JULIA KASTENBAUM TRUST, HARRY

MICHAEL KASTENBAUM TRUST, STUART MEYERSON, SAMUEL MANN MEYERSON

TRUST, BENJAMIN MANN MEYERSON TRUST, STUART MEYERSON 9/14/1995

CASE NO. 07-80339-CIV-MIDDLEBROOKS/JOHNSON

TRUST, SEYMOUR LAPP, SEYMOUR LAPP REVOCABLE TRUST, SYDNEY KASTENBAUM, DONALD MAYERSON, TERRY GUTKIN, BARBARA GUTKIN, TERRY B. GUTKIN AND BARBARA A. GUTKIN REVOCABLE TRUST, MAISIE POTASHNICK (collectively, "Plaintiffs"), sue Defendants ALLEN MCGEE ("MCGEE"), MICHAEL WALLACE ("WALLACE"), LLOYD GOLDMAN ("GOLDMAN"), WILFRED POSLUNS ("POSLUNS") and RADIOLOGY CORPORATION OF AMERICA, INC. ("RCOA" or the "Company") (collectively, "Defendants") and allege:

## JURISDICTIONAL ALLEGATIONS

1.      This is an action in law and in equity which seeks monetary damages, punitive damages and injunctive/equitable relief.

2.      The claims alleged herein arise, in part, under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a) (the "Exchange Act") and Rule 10b-5 promulgated there under by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5], as well as state law claims.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337.  This Court has supplemental jurisdiction of all claims arising under the common law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 78aa because the actions giving rise to this litigation occurred in the Southern District of Florida.  Most of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, certain defendants maintain their residences or place of business within this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the

United States mail.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.       Plaintiff LEILA MEYERSON is a citizen of the United States and a citizen of the State of Florida who owns shares of the common and/or preferred stock of RCOA.  LEILA MEYERSON brings this action individually, as Trustee of the LEILA MEYERSON REVOCABLE TRUST, as Trustee of the L & M MEYERSON FAMILY TRUST and as the authorized partner of the L & M MEYERSON FAMILY LIMITED PARTNESHIP, a Limited Partnership under the laws of the state of Nevada.

6.       Plaintiff DAVID MEYERSON is a citizen of the United States and a citizen of the State of New York who owns shares of the common and/or preferred stock of RCOA. DAVID MEYERSON brings this action individually and as Trustee of the DAVID MEYERSON TRUST and the JESSICA SHOSHONA MEYERSON TRUST.

7.       Plaintiff RICHARD ARON is a citizen of the United States and a citizen of the State of Florida who owns shares of the common and/or preferred stock of RCOA.

8.       Plaintiff CINDIE KASTENBAUM is a citizen of the United States and a citizen of the State of New York who owns shares of the common and/or preferred stock of RCOA. CINDIE KASTENBAUM brings this action individually and as Trustee of the HARRY MICHAEL KASTENBAUM TRUST and the JULIE SARAH KASTENBAUM TRUST.

9.       Plaintiff STUART MEYERSON is a citizen of the United States and a citizen of the State of  North Carolina who owns shares of the common and/or preferred stock of RCOA. STUART MEYERSON brings this action individually and as Trustee of the SAMUEL MANN MEYERSON TRUST, the BENJAMIN MANN MEYERSON TRUST, and the STUART MEYERSON 9/14/1995 TRUST.

10.       Plaintiff SEYMOUR LAPP is a citizen of the United States and a citizen of the

State of Florida who owns shares of the common and/or preferred stock of RCOA.  SEYMOUR LAPP brings this action individually and as Trustee of the SEYMOUR LAPP REVOCABLE TRUST.

11.     Plaintiff SYDNEY KASTENBAUM is a citizen of the United States and is a citizen of the State of Florida, who owns shares of the common and/or preferred stock of RCOA.

12.     Plaintiff DONALD MAYERSON is a citizen of the United States and is a citizen of the State of New York, who owns shares of the common and/or preferred stock of RCOA.

13.     Plaintiffs TERRY GUTKIN and BARBARA GUTKIN are citizens of the United States and are citizens of the State of California who own shares of the common and/or preferred stock of RCOA.  TERRY GUTKIN and B. GUTKIN bring these claims individually and as Trustees of the TERRY B. GUTKIN and BARBARA A. GUTKIN REVOCABLE TRUST.

14.     Plaintiff MAISIE POTASHNICK is a citizen of Florida who owns common and/or preferred stock of RCOA.

15.     RCOA is a Delaware corporation with its principal place of business in Boca Raton, Florida.  RCOA is authorized to conduct business, and does conduct business, in the Southern District of Florida.

16.     MCGEE is a citizen of the United States and is a citizen of the State of Florida. MCGEE is a control person and/or affiliate and/or insider within the meaning of the United States Securities laws.  MCGEE owns shares of the common and/or preferred stock of RCOA.

17.     WALLACE is a citizen of the United States and is a citizen of the State of Florida.  WALLACE is a control person and/or affiliate and/or insider within the meaning of the United States Securities laws.

18.     GOLDMAN is a citizen of the United States and is a citizen of the State of New York.  GOLDMAN is a control person and/or affiliate and/or insider within the meaning of the

United States Securities laws.  GOLDMAN owns shares of the common and/or preferred stock of RCOA.

19.     POSLUNS is a citizen of Canada and is a citizen of Toronto, Canada.  POSLUNS is a control person and/or affiliate and/or insider within the meaning of the United States Securities laws.  POSLUNS owns or controls shares in RCOA through the Posluns Family Foundation of Wifleur, Inc., shareholders in the common and/or preferred stock of RCOA.

## **GENERAL ALLEGATIONS**

### **Radiology Corporation of America**

20.     RCOA is a national provider of Positron Emission Tomography ("PET") and PET/CT imaging services for medical patient diagnosis and treatment and was a provider of the same services.  The Company was formed in 1997, and originally had three business areas: physician practice management, physician billing, and a mobile MRI partnership.  In 2000, the Company decided to focus solely on PET services.

21.     RCOA's original Chairman was Monroe Meyerson ("M. Meyerson").   M. Meyerson's status was changed by a vote of the Board of Directors in March 2005 and he became the non-executive Chairman.

22.     RCOA's Chief Executive Officer was MCGEE.  MCGEE became the Chairman in April 2006.

23.     M. Meyerson resigned from the Board of Directors in August 2006.

24.     At all material times, the Chief Executive Officer of RCOA was MCGEE.

25.     At all material times, the Chief Financial Officer of RCOA was WALLACE.

26.     In 2005, the Board of Directors of RCOA consisted of MCGEE, POSLUNS, GOLDMAN, Sol Levine ("Levine"), George Sarner ("Sarner"), David Crane ("Crane") and M. Meyerson (the "Board").

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

27.     From 2000 until 2004, RCOA operated its PET scanners from mobile units.  Each mobile unit had a "route" which was the area in which the mobile unit would operate.  In 2004, the Company began to open fixed sites for its PET scanners instead of relying exclusively upon mobile units.  In early 2005, RCOA management decided to close the fixed sites.

28.     As a result of costs associated with the shutdown and closure of the fixed sites, as well as the sale of certain fixed-site equipment which could not be transferred to the mobile units, RCOA, in 2005, restated its 2004 financials in which the Company took approximately $5 million in non-cash income statement adjustments.

29.     In 2005, due to a dispute with Siemens ("PetNet"), WALLACE increased an apparent liability on the Company's books to $5.5 million.  PetNet was the Company's principal supplier of isotopes used in the PET mobile units.

30.     Although the Company disputed that the liability to PetNet was $5 million and was in negotiations with PetNet over this disputed amount, WALLACE accrued the entire amount in the Company's financial books rather than the amount which the Company truly believed, at the time, might be due (approximately $3 million).

31.     Although substantially increasing the PetNet liability in the Company's financial records, the Company failed to footnote the increase or provide any information to the shareholders that the total amount of the liability was disputed.

32.     The alleged PetNet liability was accrued against the Company's 2004 financials, which in conjunction with the write-offs taken as a result of the closure of the fixed sites, further exaggerated the Company's poor 2004 financial performance.

33.     Because of these events, RCOA management took the position that the Company was experiencing a period of undercapitalization.  This position, however, was based upon the massive non-cash write-offs and accruals which the Company took against the 2004 financials,

when in fact the Company had experienced only a minor cash loss in 2004.

### The Sale of Preferred D-Stock

34.     In May 2005, RCOA management decided to open six new mobile routes for mobile PET scan units.  To fund new routes, management believed that RCOA needed to raise $3 million in additional capital.

35.     In or about June 2005, MCGEE decided that the reason that should be given to shareholders for the necessity to raise capital should be RCOA's alleged financial problems, rather than the costs involved in the decision to open the six new mobile routes.

36.     MCGEE called a meeting of the Board of Directors of RCOA to announce that the company was in a "Zone of Insolvency."  The term "Zone of Insolvency" was used by attorney Bruce March of the law firm of Greenberg Traurig, which was consulted privately by MCGEE prior to the board meeting.  The Company's attorneys did not independently determine whether the Company was in fact insolvent, but instead relied upon the false and fraudulent information provided to them by MCGEE and WALLACE.

37.     At the July 19, 2005 Board Meeting, MCGEE proposed that the Company raise additional capital through the sale of additional preferred stock.  MCGEE's rationale for a rights offering of stock was to allow all shareholders an opportunity to participate.  However, because MCGEE and the other Defendants had access to information which was not available to other shareholders (as more fully described below), such a rights offering was not, in fact, an equal opportunity for all shareholders.

38.     Several alternatives were proposed for raising additional funds, including a sale of company assets and taking out loans.

39.     At the Board meeting, Monroe Meyerson and George Sarner voted against the stock offering.  However, they were outvoted (4-2) and a motion to proceed with the preparation

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

of a preferred stock offering was passed by the other board members.

40.     On August 23, 2005, MCGEE called a Board meeting to re-approve the preferred stock offering.  M. Meyrson, who was ill from pneumonia and hospitalized, attended the meeting by telephone.  The other Board members pressured M. Meyerson to agree to the preferred stock offering.  After three hours on the telephone conference, and out of fatigue and judgment clouded by his illness, M. Meyerson agreed with the rest of the Board to authorize the preferred stock offering.

41.     Several days later M. Meyerson, having recovered from his illness, notified the Board that he had reconsidered his position and wanted to change his vote against the stock offering.  The other board members, however, remained committed to the stock offering, and thus the Company began to proceed with the preparation of the offering.

## The Convertible Sub-Debt

42.     An obstacle stood in the way of the proposed stock offering.  Before the preferred stock offering could proceed, RCOA had to satisfy outstanding convertible Subordinated debentures ("Sub-debt") into a new proposed class of preferred stock (the "E-Stock").

43.     On October 21, 2005, RCOA sent an Exchange Memorandum to the holders of the Sub-debt ("Exchange Memorandum").  The Exchange Memorandum began:  "As you all are probably aware, the Company's financial condition is very grave.  Unless drastic action is taken immediately, the Company will likely be required to file for bankruptcy protection and may be forced to cease operations."[1]

44.     This characterization and threat of bankruptcy, however, was false and was designed to paint an overly pessimistic picture of the financial heath of RCOA.  At the time, the Defendants knew that the finances of RCOA were not "grave," that bankruptcy was not on the

---

[1] A true and correct copy of the Exchange Memorandum with its cover letter are attached hereto as Exhibit "1"

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

horizon, and there was no imminent danger of ceasing operations.  In fact, RCOA's finances were in a much better position than represented in the Exchange Memorandum.

45.     The Exchange Memorandum further stated that the Company was preparing to raise $3.3 million to $4 million in capital.  To do so, it needed to convert the Sub-debt to E-Stock due to an alleged drafting error in the provisions of the debenture documents which would have allowed the Sub-debt holders to convert their debt into common stock at $.01 per share and thereby receive approximately 420 million shares of common stock.  This amount was greater than the authorized stock of the Company.

46.     The Exchange Memorandum proposed converting the Sub-debt into E-Stock at $6.00 per share.

47.     The Sub-debt holders disagreed with the proposed conversion price of the E-Stock, believing that the price should be significantly lower.  The Sub-debt holders also did not concede that there was a drafting error in the debenture documents, but rather took the position that the provisions in the debenture documents were proper and that the Sub-debt holders could, through their conversion of the Sub-debt to RCOA common stock, assume voting control of the Company.

48.     As part of the effort to force the Sub-debt holders to accept and pay a higher conversion price for the E-Stock and to avoid having the Sub-debt holders convert their rights into common stock, WALLACE and the Company's attorneys from Greenberg Traurig told the Sub-debt holders that the Company had prepared bankruptcy petitions, which the Company threatened to file in Delaware if the proposed conversion was not agreed to.

49.     In negotiations with the Company, the Sub-debt holders requested up-to-date quarterly and annual reports, as well as a business plan or budget for 2006.

50.     RCOA management, however, refused to provide such financial information to

the non-management Sub-debt holders, stating that neither a current business plan nor a 2006 budget was available because of the allegedly disastrous financial condition of the Company at that time.

51.     The Sub-debt holders also requested information about RCOA's plans to resolve the PetNet dispute.  They were told that the Company had incurred a $5.5 million liability to PetNet.  In fact, the Company implied that it had reached an agreement with PetNet fixing the liability at $5.5 million.  MCGEE even provided a Term Sheet setting forth this agreement, which he had signed.  The Sub-debt holders were not informed that the Company knew that it was going to dispute the PetNet liability, that the Company had already determined that it was entitled to substantial credits, or that the $5.5 million liability to PetNet was not accurate.

52.     The Sub-debt holders also requested a draft of the D-Stock offering, but the Company refused to provide them with a copy or even a draft of the offering.

53.     On or about November 16, 2005, the Company offered a $1 per share conversion price for the Sub-debt, with a preference over the Company's preferred A-Stock.

54.     In addition, the Company offered the Sub-debt holders the ability to participate in a $1 million bridge loan to the Company.  The interest on the bridge loan was to be paid in D-Stock rather than in cash.

55.     WALLACE represented to the Sub-debt holders that MCGEE had provided a check in the amount of $500,000.00 for the bridge loan, but that the Company was not going to deposit these funds until the D-Stock offering was made.  The Sub-debt holders were told that they could also participate on a pro rata basis in the bridge loan.

56.     The Sub-debt holders agreed to this offer.  Had they been aware of the true financial condition of the Company, they never would have consented to the conversion of their Sub-debt to E-Stock.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

### The D-Stock Offering

57.    Once the Sub-debt issue was resolved, the Company proceeded with the D-Stock offering.

58.    On or about November 15, 2005, the Company sent a D-Stock Subscription Agreement to its shareholders offering the shareholders the right to participate in the purchase of the new D-Stock preferred shares, which would generate $4 million in new capital for the Company ("Subscription Agreement").[2]

59.    The Subscription Agreement provided each shareholder with the option to purchase their pro-rata portion of the D-Stock, at $480 per share  consistent with their ownership of the common and preferred stock.

60.    Any D-Stock that was not purchased by an existing shareholder was to be placed into an overage pool for purchase by the remaining common and preferred shareholders.

61.    RCOA wanted to price the D-Stock at $.48 per share.  However, there was insufficient authorized stock to support an offering price of $.48 per share.  Instead, the Company set a $480 per share price with the intention of authorizing additional shares after the completion of the D-Stock offering and splitting the D-Stock at a 1000-1 ratio to reduce the per share price.  In addition, the Company included a 3-1 preference for the D-Stock, which reduced the effective price of the D-Stock from $.48 per share to $.16 per share.

62.    In a section entitled "Subscriber Acknowledgments," the Subscription Agreement represents that Company had incurred a net loss of approximately $5.5 million in 2004 and had an accumulated deficit in retained earnings of $29.4 million.

63.    The Subscription Agreement represented that RCOA had suffered an additional $3.8 million in losses through September 2005.

---

[2] A true and correct copy of the Subscription Agreement is attached hereto as Exhibit "2."

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

64.     These alleged losses included the $5 million in non-cash write-offs which the Company had included in the restated financials for 2004.  However, there was no explanation of how the losses were calculated.

65.     This information was designed, in conjunction with the purported risks detailed below, to present a misleading and unduly pessimistic depiction of the Company's future prospects.  In reality, the Company had only experienced a minor cash loss in 2004.

66.     The Subscription Agreement further stated that, pending the completion of the D-Stock offering, the Company was on credit hold status with General Electric, one of the Company's suppliers of PET equipment.  This information, in conjunction with the risks detailed below, was disseminated to present a misleading and unduly pessimistic depiction of the Company's future prospects.  In fact, General Electric had strangely demanded the $3 million injection of capital (after discussing with MCGEE) in order to eliminate the credit hold status; but once the $3 million was raised, the issue of the credit hold would no longer be a risk to the Company.

67.     In fact, it was General Electric who mysteriously specified the infusion of capital would need to be effectuated through a rights offering.  This additional information was omitted from the Subscription Agreement.

68.     In actuality, General Electric's demand for a $3 million infusion of capital occurred only after MCGEE met with General Electric employees to discuss the credit hold which General Electric had placed on RCOA.  MCGEE had already determined that the Company needed an infusion of $3 million in additional capital to fund the new mobile routes.  Thus, MCGEE urged General Electric to make the $3 million infusion of additional capital a condition of its continued credit.  This limited RCOA's liability to explore alternative sources of raising funds.

69.     The Subscription Agreement also warned the prospective purchasers that the investment was "highly speculative" and included the risk of the loss of their entire investment. This statement was designed, in conjunction with the risks detailed below, to present a misleading and unduly pessimistic depiction of the Company's future prospects.

70.     The Subscription Agreement contained an extensive section entitled "RISKS RELATED TO THE CORPORATION'S BUSINESS" which painted an overly pessimistic picture regarding the financial condition of the Company.

71.     In a Sub-section entitled "Limited Operating History," the Agreement warned that RCOA's PET operations had a limited operating history and that there were "risks, expenses and difficulties frequently encountered by companies in their early stages of developments . . ." and that there was no assurance that RCOA would be successful in addressing those risks.  This statement was designed, in conjunction with the risks detailed below, to present a misleading and pessimistic depiction of the Company's future prospects.

72.     Under a sub-section entitled "Net Losses; Accumulated Deficit," the Agreement warned shareholders that the Company "expects future losses and may never become profitable." On the contrary, as detailed below, the Defendants were aware that the prospects of the Company for future profitability were considerably improved.  Furthermore, the net losses that the Company stated it had incurred, especially in 2004, were the result of one-time non-cash write-offs and accruals, particularly the improper accrual/disclosure of the overstated $5 million PetNet dispute.

73.     Under a sub-section entitled "Solvency," the Subscription Agreement warned that "Currently the Corporation's revenues are insufficient to cover its expenses," "it could be forced to filed for protection under federal bankruptcy laws," and that the shareholders "could lose their entire investment."

74.     To the contrary, the Defendants were aware that the Company's prospects for future profitability were considerably improved.  The potential of filing bankruptcy was remote and was used as a ploy, similar to the threat used against the Sub-debt holders, to discourage and scare investors.

75.     The alleged "insolvency" of the Company was based on the one-time non-cash write-offs and accruals; particularly the improper accrual/disclosure of the PetNet dispute.

76.     By making the Company appear to be in a weaker financial state than it really was, the Company was falsely representing that the Company was insolvent.   In fact, management knew that the Company was planning to dispute the PetNet liability and thus was aware that the PetNet liability was neither as dire, nor as urgent as represented in the Subscription Agreement.

77.     In a sub-section entitled "Liability to PetNet," the Subscription Agreement stated that there was a significant ($4,669,995) liability that the Company owed to PetNet and that it was obligated under an alleged agreement with PetNet to make payments of $100,000.00 per month towards this obligation and that the balance owed would receive a discount if the Company paid the balance by September 25, 2006.

78.     Previously, at least one of the board members, M. Meyerson, had advised that the Company's position regarding the alleged liability to PetNet was incorrect and that the liability, if it existed at all, was substantially lower than the amount disclosed in the Subscription Agreement.

79.     The sub-section regarding PetNet omitted this information.   The issue of the alleged PetNet liability was one of the most significant factors affecting the future viability of the Company.  Because the Company planned to dispute the PetNet liability, the dire effects of the alleged September 2006 "balloon" payment to PetNet were not as threatening as claimed in the

Subscription Agreement.

80.     The Subscription Agreement, and in particular the "RISKS RELATED TO THE CORPORATION'S BUSINESS" section, was designed to paint an overly pessimistic picture of the current and future financial condition of the Company by making misrepresentations and misleading statements and omissions.

81.     The intent of the misrepresentations and omissions was to discourage existing shareholders from participating in the D-Stock offering, which would allow their unsubscribed shares to be purchased by the inside directors and officers of RCOA who were aware of the true financial state of the Company.

82.     On December 19, 2005, RCOA sent "Amendment Number 1 to Subscription Agreement for Series D Preferred Stock of Radiology Corporation of America ("Amendment")[3] in which RCOA now disclosed that the Company had <u>not</u> entered into a definitive settlement agreement with PetNet (as previously represented) and was still negotiating with PetNet. Although the Amendment advised that the Company was still negotiating a settlement with PetNet, the Company affirmatively represented that it received a term sheet containing the provisions outlined in the Subscription Agreement, that the Company has been making monthly payments pursuant to the term sheet, but that PetNet and the Company have not signed the definitive Settlement Agreement.  Thus, although correcting the misstatement that the Company "has reached an agreement with PetNet," the Amendment clearly further represents that the term sheet represents the definitive settlement agreement that will likely be entered into, that the Company is making the $100,000.00 per month payments, and that the liability to PetNet was $5 million.  Nowhere in the Amendment does the Company affirmatively state that it intended to dispute the entire $5 million liability, that it was not required to make payments of $100,000.00

---

[3] A true and correct copy of the Amendment is attached hereto as Exhibit "3."

per month, or that there was no threat of a balloon payment in September 2006.  Further, the Amendment did not correct or modify the financial information provided with the Subscription Agreement, which falsely contained the entire alleged liability to PetNet.  Thus, the Amendment continued to misrepresent the facts to the shareholders.

83.     By the time the Amendment was mailed on December 19, 2004, many of the existing shareholders had already made their decision regarding whether to participate in the D-Stock offering.  The Amendment created additional confusion regarding the status of the alleged $5 million liability to PetNet; an opportunity which was taken advantage of by the Defendants.  With the deadline for the Subscription only 9 business days after the Amendment was mailed, many shareholders had already sent in their papers and others had already decided not to exercise their contractual right to the D-Stock or the overage.

**The Conspiracy**

84.     Because Management and several of the Board of Directors were aware that the Company was not in as bad of a financial condition as represented to the shareholders, these individuals, MCGEE, WALLACE, GOLDMAN, and POSLUNS concocted the D-Stock offering as a tool for increasing their ownership and control of the Company at the expense of the Minority Shareholders.

85.     The co-conspirators painted an overly pessimistic and false picture of the Company in connection with the conversion of the Sub-debt, to coerce the Sub-debt holders to convert their subordinated debentures.  This conversion was the first part of the Defendants' scheme and paved the way for the offering of the D-Stock Subscription Agreement to the shareholders.

86.     The co-conspirators knew that if they could paint an overly pessimistic and false picture of the Company, many existing shareholders would not participate, or would not fully

participate, in the D-Stock offering.   This would allow the co-conspirators to buy the unsubscribed shares at a bargain price.

87.    Management knew that the Company was about to enter a period of increased financial success.  The Defendants used this knowledge to increase their proportional ownership through the purchase of unsubscribed shares from the shareholders who were not privy to the same financial information.   In fact, by mid-December 2005, the Defendants had already disseminated draft 2006 budgets demonstrating that they knew the Company would be in a far superior financial position by the end of 2006 and would be profitable.  Despite having access to the 2006 Budget information, the Defendants did not include the Budget information in the Subscription Agreement or Amendment so that they could use their inside information to their advantage.

88.    The information provided to the Sub-debt holders, who were also shareholders in the Company, was designed to discourage further investment by the Sub-debt holders.

89.    The information provided to the existing shareholders in the Subscription Agreement was likewise designed to discourage investment by the shareholders in the D-Stock offering; and particularly to discourage any shareholders from participating in the overage pool of unsubscribed D-Stock.

90.    The December 19, 2005 Amendment, while ostensibly provided to clarify certain statements in the Subscription Agreement related to the PetNet "settlement agreement;" was in fact designed to further discourage the existing shareholders by providing last-minute material modifications to the Subscription Agreement.

91.    In anticipation that a number of the Minority Shareholders were not going to participate in the D-Stock offering and exercise their contractual right to purchase D-Stock as a result of their scheme, MCGEE, GOLDMAN and POSLUNS invested funds to not only buy

their pro rata allotment, but to also purchase stock from the overage pool.

92.     Despite representing that the Company was in a dire financial position, MCGEE, GOLDMAN, and POSLUNS simultaneously placed at least $2 million with the Company to purchase stock from the overage pool.  These funds were submitted before the issuance of the December 19, 2005 Amendment.  However, the amount invested by the insiders was not disclosed in the Amendment.

93.     As a result of the misrepresentations about the grave financial condition of the Company, purportedly necessitating the offering of the preferred D-Stock, numerous shareholders did not participate in the D-Stock offering.  Thus, their contractual right to the non-subscribed shares (approximately 20% of the amount offered, or $800,000.00 worth of D-Stock) went into the overage pool, which was then transferred to those other current shareholders who subscribed to buy more than their pro-rata share.

94.     Not surprisingly, the vast majority of these non-subscribed shares were purchased by Management and other insiders who knew about the financial position of the Company.  By acquiring the non-subscribed D-Stock, MCGEE, GOLDMAN and POSLUNS (hereinafter the "Majority Board Directors") were able to solidify their voting control of the company (from approximately 45% to 51% at a time when they knew (but the non-director shareholders did not) that the Company's financial condition was not as bad as represented and would be improving markedly in the near future.

95.     As a result of the conversion of Sub-debt and the D-Stock offering, Management and the Majority Board Directors have now consolidated their control over the Company, to the detriment of the Minority Shareholders.

96.     It was the intent of the Defendants to commit securities fraud, multiple violations of the federal and state securities laws, state securities fraud, common law fraud, breach of

fiduciary duty and negligent misrepresentations, and the Defendants did unlawfully, willfully, recklessly and knowingly by the use of the means and instrumentalities of interstate commerce and/or the mails, directly and indirectly, use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of the Federal Regulations, § 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons in connection with the sale of RCOA's stock.

97.     The conspiracy commenced in or about April 2005 and continued through and including September 1, 2006, with most of the illegal activity occurring between October 1, 2005 and January 3, 2006.

98.     All of the Defendants, acting either alone or in combination with certain of the other Defendants named herein, caused the overt acts described above to be undertaken in furtherance of the conspiracy.

### Usurious Loans and Excessive Bonuses

99.     In addition to the misrepresentations relating to the financial condition of the Company, in late, 2005, MCGEE provided a $500,000 bridge loan to RCOA in order to allegedly maintain the Company's liquidity prior to the completion of the D-Stock offering.  The bridge loan was provided by the AJM Family Trust.  The D-Stock offering was expected to close by the end of 2005.

100.     Although the $500,000.00 loan was originally supposed to be part of the $1 million bridge loan from the Sub-debt holders, the Company in fact treated MCGEE's loan

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

separately from the Sub-debt bridge loan.

101.     As compensation for making this special bridge loan, MCGEE received and accepted an extraordinary and usurious amount of interest.

102.     Although the interest provisions of the bridge loan were allegedly designed to compensate MCGEE for extraordinary risks associated with the alleged "grave" financial condition of the Company in late 2005, there was no such "grave" condition and MCGEE was assuming no extraordinary risk for which he has been extraordinarily and unnecessarily compensated.

103.     In fact, the bridge loan violated the Company's Senior Credit Agreement and subordinated debt instruments by allowing MCGEE to receive the principal and interest on this loan without a waiver from the more senior debt holders of the Company.  MCGEE's bridge loan was also secured by certain assets of the Company, creating an additional Event of Default under the Senior Credit Agreement.

104.     MCGEE received $82,500.00 in interest, even though MCGEE was repaid by the Company out of the proceeds of the D-Stock offering only six weeks after the loan was made. The actual interest rate the Company paid to MCGEE was approximately 135% interest for the six week loan.

105.     Because MCGEE's bridge loan did not exceed $500,000, it was a usurious contract under Section 687.02 and 687.03, Florida Statutes.

106.     Moreover, the 135% interest paid to MCGEE constitutes criminal usury under Section 687.071, Florida Statutes.

107.     In addition to the usurious interest payouts to MCGEE, the Company also paid WALLACE a $100,000.00 end-of-year bonus in 2005, at a time when the Company was allegedly short on cash and facing financial ruin if the D-Stock offering was not consummated.

108.    The WALLACE bonus was designed to reward WALLACE for his role in the D-Stock conspiracy since, as only a salaried employee of the Company, he was not in a position to substantially participate in the D-Stock offering.  The payment of the bonus was directly contrary to WALLACE's representations that he was not benefiting in any way from the D-Stock offering.  Further, as CFO of RCOA, WALLACE was asked by individuals whether they should exercise their rights to purchase D-Stock and WALLACE dissuaded them from doing so by falsely representing that the investment would be too risky.

109.    The Board of Directors did not approve the bonus to WALLACE prior to when it was paid.

110.    Neither MCGEE's bridge loan interest payment nor WALLACE's end-of-year bonus were disclosed in the Subscription Agreement.   Although the MCGEE loan was referenced, there was no disclosure of the usurious interest, the fact that the loan was an Event of Default under the Senior Credit Agreement, nor the fact that the loan was secured.

111.    The Minority Shareholders were not advised that McGEE and WALLACE were receiving such generous compensation at a time when the Company was representing to the Minority Shareholders that the Company was in grave financial circumstances.

### The "Miraculous" Turnaround of RCOA

112.    Despite the requests of the Sub-debt holders in late 2005 for financial information and the Defendant's statements that no such information was available, Management actually began working on a budget in October 2005.   By mid-December 2005, Management had substantially finalized the 2006 Budget.  None of this information, however, was provided to the shareholders before the D-Stock offering was completed on January 3, 2006.

113.    The Defendants, however, were privy to the information used to compile the 2006 Budget.  They were also aware that the representations made in connection with the Sub-debt

conversion and the D-Stock offering were materially different from the projections in their own budget.

114.   Less than two weeks after the consummation of the D-Stock offering, Management internally disseminated the completed 2006 budget, which painted a much rosier picture for the Company in 2006 than the "grave" conditions previously reported to the minority shareholders.

115.   This budget was disseminated to the Board on January 16, 2006, although Management had been aware of the improved financial prospects for 2006 as early as November – December 2006.

116.   The 2006 budget was approved by the Board of Directors on January 20, 2006.

117.   Management also proceeded with its undisclosed plan to deal with the PetNet issue.

118.   Despite previously booking a $5 million liability and misrepresenting the purported negotiations with PetNet, on March 24, 2006, attorneys from Greenberg Traurig sent a letter to PetNet stating that RCOA was owed over $700,000.00 and did not owe PetNet the $5 million as previously detailed in the Subscription Agreement.

119.   Just weeks later, without any litigation, a settlement was reached between RCOA and Siemens whereby the amount which the Company was to pay was reduced to $2 million (rather than $5 million), to be paid over a three year period at a lower interest rate (7% versus 14%).   This amount was much more favorable to the Company than represented to the shareholders at the time of the D-Stock offering and Sub-debt conversion.

120.   As a result of the PetNet settlement, RCOA also received a reduction on its isotope purchases from PetNet, resulting in a further savings to the Company of approximately $1 million per year.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

121.     Not surprisingly, the Company exceeded its profitable 2006 Budget and appears to be facing an even brighter future.

122.     As a result of their purchases of the D-Stock from the overage pool, the Majority Board Directors are now in a position to maximize their controlling interests in the Company at the expense of the non-director shareholders who were deliberately scared away from the D-Stock offering and/or who did not participate in the overage pool.

123.     RCOA was never in a "Zone of Insolvency," as MCGEE and Bruce March of Greenberg Traurig originally stated to the Board in or about June 2005.

124.     Rather, the "Zone of Insolvency," material misrepresentations, and significant omissions were contrived to initiate the D-Stock offering as part of the conspiracy detailed above.

## COUNT 1
## FEDERAL SECURITIES FRAUD:  § 10(B)-5
### (E-Stockholders against MCGEE, WALLACE, GOLDMAN, POSLUNS, AND RCOA)

125.     Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 as if fully set forth herein.

126.     Plaintiffs RICHARD ARON, SYDNEY KASTEBAUM, SEYMOUR LAPP, and LEILA MEYERSON ("E-Stockholders"), all purchased E-Stock.  The E-Stockholders own approximately 45% of the E-Stock (1,956,620/4,323,434).

127.     The actions of MCGEE, WALLCE, GOLDMAN, and POSLUNS constitute securities fraud under the laws of the United States of America.

128.     Specific violations by MCGEE, WALLACE, GOLDMAN, and POSLUNS include violations of §10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder.   MCGEE, WALLACE, GOLDMAN and POSLUNS schemed to defraud the E-Stockholders and others similarly situated by making false and

misleading statements and omissions of material fact as set forth above.

129.    MCGEE, WALLACE, GOLDMAN and POSLUNS made misstatements and omissions of material fact in connection with the sale of purchase of securities.

130.    MCGEE, WALLACE, GOLDMAN and POSLUNS knew that the above misstatements and omissions were false and misleading.

131.    MCGEE, WALLACE, GOLDMAN and POSLUNS made the above misstatements and omissions to induce the E-Stockholders to rely upon them for the improper purpose of forcing the E-Stockholders to forego their Sub-debt in return for E-Stock at a greatly inflated and improper price.

132.    The E-Stockholders justifiably relied upon the misstatements and omissions to their detriment.

133.    The E-Stockholders were substantially damaged as a result of being induced to convert their Sub-debt to E-Stock.

134.    As discussed above, the conversion of the Sub-debt to the E-Stock was necessary in order to permit the Defendants to proceed with the D-Stock offering.

135.    Pursuant to the Convertible Subordinated Debenture dated January 31, 2001 which created the Sub-debt: "if at the time of automatic conversion the Debenture holders have not achieved a 15% percent return on this investment, compounded annually, the Debenture shall convert at the "fair market value" per share of Common Stock of the Company at the time of the conversion."

136.    Based on the misrepresentations and threats that the Company would file bankruptcy if the Sub-debt holders did not convert to E-Stock, the Sub-debt holders agreed to purchase E-Stock through a conversion of their Sub-debt at the rate of $1.00 per share.

137.    The information provided to the Sub-debt holders was that the Company was

going to file bankruptcy if they did not convert to E-Stock and the D-Stock offering did not go through.  The information included the misrepresentations regarding the PetNet liability.

138.    In fact, the Defendants refused to provide the Sub-debt holders with financial information, budget information, or even information relating to how the D-Stock rights would affect the Sub-debt and/or the E-Stock.

139.    Prior to the conversion of the Sub-debt to E-Stock and the issuance of the D-Stock, the face value of the Sub-debt was approximately $4.3 million.  The interest rate was 15%.  The Sub-debt was senior to the Series C Preferred Stock, Series A Preferred Stock, and Common Stock.  The Sub-debt was junior to approximately $15 million of senior debt (which included the fabricated PetNet liability).  Finally, the Sub-debt holders had the right to convert, into Common Stock, at fair market value as of December 31, 2005.

140.    As a result of the fraudulent activities of the Defendants, which coerced the Sub-debt holders to convert to E-Stock and as a result of the subsequent D-Stock offering, the Sub-debt holders who purchased E-Stock were substantially damaged.  The Sub-debt/E-Stock owners suffered the following damages:

   a.    The liquidation preference of the Sub-debt was reduced to $3 million, a loss of $1.3 million of value;

   b.    The interest rate on the Sub-debt was reduced to 7%, an ongoing loss of 8% per year;

   c.    The Sub-debt became junior to the Series D Preferred Stock;

   d.    The Sub-debt became junior to the Series C Preferred Stock;

   e.    The Sub-debt became junior to approximately $40 million of senior debt and liquidation preferences, whereas it was only junior to approximately $15 million of senior debt before the conversion and D-Stock offering;

and

    f.       The Sub-debt holders agreed to a conversion price of $1.00 per share for common stock, which, as further discussed below, was greatly in excess of the fair market value represented by RCOA through the issuance of the D-Stock.

141.    The D-Stock offering sold shares at $.48 per share.   There was also a 3-1 preference for the D-Stock, which reduced the actual cost to $.16 per share.   The price of $.48 per share reflected an improper fair market price for the stock being offered.

142.    This improper fair market price was further determined as a result of the fraudulent information provided and utilized by the Company and its professionals.

143.    Notwithstanding, based on the fair market value established by the Company when issuing the D-Stock, the Sub-debt holders were further damaged by not receiving prices and terms of the D-Stock as follows:

    a.       The liquidation preference to the Sub-debt holders was reduced by $10 million, from the $13 million preference they would have received as D-Stock to the $3 million preference provided by the E-Stock;

    b.       The Sub-debt holders became junior to approximately $7 million in liquidation preferenced to the C shareholders;

    c.       The Sub-debt holders became junior to $40 million of senior debt and liquidation preferences, as opposed to the $15 million the D-Stock is junior to, damaging their position by $25 million; and

    d.       The Sub-debt would have been entitled to convert into 27 million shares of Common Stock as D-Stock versus 4 million shares of common stock as E-Stock, a reduction of 23 million shares.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

144.     Based upon the foregoing, the purchasers of E-Stock paid $1 per share, when they should have paid the fair market value as represented by RCOA in the D-Stock offering, effectively $.16 per share, immediately after the conversion of Sub-debt to E-Stock.

145.     The Sub-debt holders who purchased E-Stock have been damaged as a direct and proximate result of the Defendants' actions.   The E-Stockholders are entitled to damages or rescission.

146.     The Sub-debt holders are entitled to an award of punitive damages against MCGEE, WALLACE, GOLDMAN and POSLUNS, jointly and severally, as a result of their fraudulent conduct and to punish them for their wrongdoing.

### COUNT 2
### FEDERAL SECURITIES FRAUD: § 10(b)-5
### (D-Stockholders against McGEE, WALLACE, GOLDMAN, POSLUNS, and RCOA)

147.     Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 as if fully set forth herein.

148.     The Plaintiffs purchased the D-Stock pursuant to the Subscription Agreement.

149.     In addition to the right to purchase the D-Stock allocated to each of the D-Stock shareholders, the D-Stock shareholders had the contractual right to purchase additional D-Stock.

150.     Pursuant to the Subscription Agreement, in addition to the offer of the pro rata share:

> [T]he Corporation is offering up to **$8,334** shares of the Corporation's Series D Convertible Preferred Stock . . . (ii) second, to the extent any Series D Preferred Stock remains unsubscribed for, to the holders who have expressed an interest to the Corporation to purchase more than their pro rata share of such Series D Preferred Stock.  Set forth on the signature page to this Agreement is the number of shares of Series D Preferred Stock being offered to you pursuant to Clause (i), which represents your pro rata portion of the Series D Preferred Stock.   The proceeds of the offering will be used for working capital for the Corporation.
>
> **At the time of subscription, Subscribers will be required to remit an amount equal to 100% of the subscription price of their total intended**

LEE & AMTZIS, P.L.
ATTORNEYS at Law

> **purchase amount of Series D Preferred Stock. Such payment may be in the form of a personal check made payable to the Corporation or by wire transfer to the Corporation's account.**

(Exhibit 2, p. 1)(emphasis in original).

151.    Thus, the Plaintiffs were provided with a contractual right to purchase additional D-Stock.

152.    Based on the fraud and misrepresentations alleged above, the Plaintiffs did not exercise their rights and, instead, their rights were transferred to the overage pool and purchased by the Defendants.

153.    The Plaintiffs were not compensated for the transfer of these rights to the Defendants.

154.    The Plaintiffs transferred these rights because they believe the misrepresentations.

155.    The Plaintiffs relied upon the misrepresentations in determining not to exercise their contractual rights.

156.    The actions of MCGEE, WALLACE, GOLDMAN and POSLUNS constitute securities fraud.

157.    Specific violations of the Defendants MCGEE, WALLACE, GOLDMAN and POSLUNS collectively include violations of §10(b) and 20(a) of the Exchange Act [15 U.S.C. §78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder.

158.    MCGEE, WALLACE, GOLDMAN and POSLUNS schemed to defraud Plaintiffs and all others similarly situated by making the false and misleading statements and omissions of material fact as set forth above.

159.    MCGEE, WALLACE, GOLDMAN and POSLUNS misstatements and omissions of material fact were made in connection with the sale or purchase of securities.

160.    MCGEE, WALLACE, GOLDMAN and POSLUNS knew that the above

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

misstatements and omissions were false and misleading.

161.    MCGEE, WALLACE, GOLDMAN and POSLUNS made the above misstatements and omissions to induce Plaintiffs to rely upon them for the improper purpose of discouraging the Minority Shareholders from participating in the RCOA D-Stock offering in order for MCGEE, GOLDMAN and POSLUNS to consolidate their ownership and voting control of the Company.

162.    Plaintiffs and all others who permitted their contractual D-Stock rights to be purchased by the Defendants justifiably relied upon the above misstatements and omissions to their detriment.

163.    Plaintiffs and all others similarly situated have been harmed by the fraud perpetrated upon them by MCGEE, WALLACE, GOLDMAN and POSLUNS collectively and acting either alone or in concert with some or all of the other defendants, and are entitled to rescission of the overage purchases jointly and severally from MCGEE, WALLACE, GOLDMAN and POSLUNS for such fraud.

164.    The Plaintiffs are also entitled to an award of punitive damages against MCGEE, WALLACE, GOLDMAN and POSLUNS, jointly and severally as a result of their fraudulent conduct and to punish them for their wrongdoing.

**COUNT 3**
**VIOLATIONS OF SECTION 20 OF THE EXCHANGE ACT**
**(E-Stockholders against MCGEE AND WALLCE)**

165.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 and 126 through 146 as if fully set forth herein.

166.    The E-Stockholders assert this Count for violations of Section 20A of the Exchange Act against MCGEE and WALLACE.

167.    As Senior Executive Officers of RCOA, MCGEE and WALLACE are liable as

direct participants in the wrongs complained of herein.

168.    Through their positions of control authority and/or stock ownership, MCGEE and WALLACE were able to and did control, directly or indirectly, the content of the statements and information disseminated by RCOA.

169.    With knowledge of the falsity of the statements contained herein and/or in reckless disregard of RCOA's true financial condition, MCGEE and WALLACE caused or controlled the issuance of statements and other information to contain misstatements and omissions of material facts.

170.    MCGEE and WALLACE are liable as controlling persons as that term is used in Section 20 of the Exchange Act.

171.    The E-Stock shareholders relied upon the misstatements and omissions by converting their Sub-debt to E-Stock.

172.    By reason of the foregoing, the E-Stockholders have suffered damages as a result of the actions of MCGEE and WALLACE in an amount to be determined at trial.

**COUNT 4**
**VIOLATION OF SECTION 20 OF THE EXCHANGE ACT**
**(Plaintiffs against McGEE and WALLACE)**

173.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 and 148 through 164 as if fully set forth herein.

174.    The D-Stockholders assert this Count for violations of Section 20A of the Exchange Act against MCGEE and WALLACE.

175.    As Senior Executive Officers of RCOA, MCGEE and WALLACE are liable as direct participants in the wrongs complained of herein.

176.    Through their positions of control authority and/or stock ownership, MCGEE and WALLACE were able to and did control, directly or indirectly, the content of the statements and

information disseminated by RCOA.

177.   With knowledge of the falsity of the statements contained herein and/or in reckless disregard of RCOA's true financial condition, MCGEE and WALLACE caused or controlled the issuance of statements and other information to contain misstatements and omissions of material facts.

178.   MCGEE and WALLACE are liable as controlling persons as that term is used in Section 20 of the Exchange Act.

179.   The D-Stock shareholders relied upon the misstatements and omissions by converting their Sub-debt to D-Stock.

180.   By reason of the foregoing, the D-Stockholders have suffered damages as a result of the actions of MCGEE and WALLACE in an amount to be determined at trial.

**COUNT 5**
**FRAUD - RESCISSION OF D-STOCK OFFERING**
**(Plaintiffs against RCOA, McGEE, GOLDMAN, and POSLUNS)**

181.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 as if fully set forth herein.

182.   The actions of all the Defendants, both individually and/or collectively, demonstrate a fraudulent disregard of the Minority Shareholders' rights.

183.   As the Majority Board Directors, MCGEE, GOLDMAN and POSLUNS have obtained majority voting rights and control of the Company and have enriched themselves at the Company's and the Plaintiffs' expense.

184.   MCGEE, GOLDMAN and POSLUNS, as set forth herein above, have demonstrated substantial misconduct by the Company's officers and/or directors, breach of trust, and circumstances showing imminent danger of great loss to the Minority Shareholders, which otherwise cannot be prevented.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

185.    The Defendants' fraudulent conduct establishes a basis to rescind the D-Stock offering.

186.    By reason of the aforesaid wrongdoing on the part of the Defendants, the Plaintiffs are entitled to rescind the D-Stock offering in its entirety.

187.    The Plaintiffs seek rescission of the overage shares purchased by the Defendants in the D-Stock offering.

188.    The Plaintiffs therefore petition this Court to exercise its inherent equitable powers to order the rescission of the overage shares purchased by the Defendants in the D-Stock offering, restoration of shareholder ownership and control to the pre-offering positions of all shareholders, permitting the shareholders who did not purchase D-Stock to purchase the rescinded shares, and permitting all shareholders to take part in purchasing from any overage.

**COUNT 6**
**FRAUD-RESCISSION OF EXCHANGE MEMORANDUM**
**(E-Stockholders against RCOA, McGEE, GOLDMAN and POSLUNS)**

189.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 as if fully set forth herein.

190.    The actions of all of the Defendants, both individually and/or collectively, demonstrate a fraudulent disregard of the Sub-debt holders' rights.

191.    As the Majority Board Directors, MCGEE, GOLDMAN and POSLUNS have obtained majority voting rights and control of the Company and have enriched themselves at the Company's and the Plaintiffs' expense.

192.    MCGEE, GOLDMAN and POSLUNS, as set forth herein above, have demonstrated substantial misconduct by the Company's officers and/or directors, breach of trust, and circumstances showing imminent danger of great loss to the Sub-debt holders which otherwise cannot be prevented.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

193.    The Defendants' fraudulent conduct establishes a basis to rescind the conversion of Sub-debt to E-Stock by way of the Exchange Memorandum.

194.    By reason of the aforesaid wrongdoing on the part of the Defendants, the Plaintiffs are entitled to rescind their purchases of the shares of the E-Stock that they presently own as a result of their conversion of the 15% Convertible Subordinated Debentures.

195.    The Plaintiffs will tender their E-Stock to the Company for the rescission of the E-Stock and the conversion of the Sub-Debt.

196.    The Plaintiffs therefore petition this Court to exercise its inherent equitable powers to order the rescission of the E-Stock offering, and a restoration of the 15% convertible subordinated debentures to the pre-offering positions of the E-Stockholders.

**COUNT 7**
**DECLARATORY JUDGMENT**
**(E-Stockholders against all Defendants)**

197.    The Plaintiffs repeat and reallege the allegations in paragraphs 1 through 124 as if fully set forth herein.

198.    As a result of the material representations and omissions further set forth herein, the Defendants have defrauded the E-Stockholders out of their valuable convertible Sub-debt rights.

199.    After the Sub-debt conversion is rescinded, the E-Stockholders are entitled to a declaratory judgment as to their rights to convert their debt into common stock $.01 per share and thereby receive shares of common stock of the Company.

200.    The E-Stockholders seek a declaration that they are entitled to convert their debt into approximately 420 million shares of common stock.

201.    The Company and the Defendants took the position that the conversion provision was a "drafting error" and that the E-Stockholders did not maintain their right to convert their

debt to common stock, even though the debt instruments clearly indicated such.

202.    The E-Stockholders are unsure of their rights as to whether they are entitled to convert their Sub-debt into common stock.

203.    There is an actual controversy in that the Company and the Board have taken the position that the Sub-debt is not convertible, in accordance with the Sub-debt agreements.

204.    The E-Stockholders are entitled to a declaration as to their conversion rights under the Sub-debt instrument.

**COUNT 8**
**BREACH OF FIDUCIARY DUTY**
**(Against MCGEE, WALLACE, GOLDMAN and POSLUNS)**

205.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 above as if fully set forth herein.

206.    MCGEE, WALLACE, GOLDMAN and POSLUNS, as officers and/or directors of RCOA, owed a fiduciary duty to the shareholders in the Company.  This duty included the obligation of full disclosure to the Minority Shareholders in connection with the D-Stock offering, as well as a duty to refrain from obtaining personal benefit in connection with the D-stock offering to the detriment of the Minority Shareholders.

207.    This duty also included the obligation of full disclosure to the Sub-debt holders in connection with the conversion of the Sub-debt to E-Stock, as well as a duty to refrain from obtaining personal benefit in connection with the Sub-debt conversion to the detriment of the Sub-debt holders.

208.    MCGEE, WALLACE, GOLDMAN and POSLUNS, individually and collectively, breached their fiduciary duties by engaging in the above-described scheme for the improper purpose of discouraging the existing shareholders from participating in the D-Stock offering in order for MCGEE, GOLDMAN and POSLUNS to consolidate their ownership and

voting control of the Company.

209.    MCGEE breached his fiduciary duty by receiving and accepting an extraordinary interest payment for the bridge loan of $500,000.00 made to ROCA, for which he received $82,500 in interest even though the loan was repaid in six weeks.

210.    WALLACE breached his fiduciary duty by receiving and accepting a $100,000.00 "bonus" from RCOA at the end of 2005, at a time when the Company was representing to the Minority Shareholders that it was in grave financial condition and on the verge of ruin if additional capital could not be raised through the D-Stock offering.

211.    The Plaintiffs have been harmed by the breach of fiduciary duty perpetrated upon them by MCGEE, WALLACE, GOLDMAN and POSLUNS, collectively and acting either alone or in concert with some or all of the other defendants.

212.    The Plaintiffs are entitled to a rescission and disgorgement of all consideration obtained by the Defendants as a result of their actions, including rescission of the purchase of the D-Stock overage and rescission of the E-Stock providers by the E-Stockholders.

**COUNT 9**
**FRAUD**
**(Against RCOA, MCGEE, WALLACE, GOLDMAN and POSLUNS)**

213.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 as if fully set forth herein.

214.    The actions of the Defendants constitute common law fraud.

215.    At the time that the representations were made concerning the financial condition, the forecast concerning the D-Stock offering, and the Sub-debt conversion, the Defendants knew that their representations were false, failed to state material facts, and were made with a reckless disregard as to their truth or falsity.

216.    The Plaintiffs did not know that the representations were false and justifiably

relied upon the representations and omissions with regard to their purchases, or failure to purchase, in connection with the D-Stock offering, the overage pool, as well as the conversion of the Sub-debt.

217.    The Plaintiffs have been harmed by the fraud perpetrated upon them by all of the Defendants collectively and acting either alone or in concert with some or all of the other defendants and are entitled to recover damages jointly and severally from all of the Defendants./

218.    The Plaintiffs are also entitled to an award of punitive damages against the Defendants, jointly and severally as a result of the fraudulent conduct of the Defendants and to punish the Defendants for their wrongdoing.

## COUNT 10
## NEGLIGENT MISREPRESENTATION
### (Against RCOA, MCGEE, WALLACE, GOLDMAN and POSLUNS)

219.    The Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 124 as if fully set forth herein.

220.    The Defendants' actions either individually or collectively constitute common law negligent misrepresentation.

221.    At the time that the representations were made concerning the financial condition and forecast concerning the Sub-debt conversion and the D-stock offering, the Defendants should have known that their representations were false or made such representations with careless disregard to their accuracy.

222.    The Plaintiffs did not know that the representations were false and justifiably relied upon the representations and omissions with regard to their purchases, or failure to purchase, in connection with the D-Stock offering, the overage pool, as well as the conversion of the Sub-debt.

223.    The Plaintiffs have been harmed by the acts or omissions of the Defendants

collectively and acting either alone or in concert with some or all of the other defendants, and are entitled to recover damages jointly and severally from all of the Defendants for such acts or omissions.

224.    The Plaintiffs are also entitled to an award of punitive damages, upon proper showing against the Defendants, jointly and severally as a result of the fraudulent conduct of the Defendants and to punish the Defendants for their wrongdoing.

WHEREFORE, Plaintiffs demand the following:

A.    Rescission of the D-Stock offering relating to the Defendants' purchases of the share overage, providing an opportunity for all shareholders to purchase the overage;

B.    Rescission of the E-Stockholders conversion of the 15% Convertible Subordinated Debentures to E-Stock;

C.    A declaration that the Sub-debt holders are entitled to convert their Subordinated Debentures into Common Stock at $.01 per share or at the fair market value;

D.    Compensatory damages;

E.    Punitive damages;

F.    Costs and attorneys' fees;

G.    A trial by jury on all issues so triable; and

H.    Such other and further relief as the may be just and proper.

CASE NO. 07-80339-CIV-MIDDLEBROOKS/JOHNSON

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Dated: July 27, 2007                  Respectfully submitted,
      Boca Raton, Florida

_____

ERIC LEE (Bar No. 961299)
lee@leeamlaw.com
Lee & Amtzis, P.L.
5550 Glades Road, Suite 401
Boca Raton, FL  33431
Telephone:  (561) 981-9988
Facsimile:  (561) 981-9980 Fax
**Attorneys for Plaintiffs**